KING v. DENVER & RIO GRANDE WESTERN R. CO.

No. 7221.   Decided November 23, 1949.   (211 P. 2d 833.)

See 57 C. J. S., Master and Servant, sec. 502. Presumption as to care by brakeman for his own safety, see note, 143 A. L. R. 978. See, also, 35 Am. Jur. 685.

*Van Cott, Bagley, Cornwall & McCarthy,* Salt Lake City, for appellant.

*Rawlings, Wallace & Black,* Salt Lake City, *Brigham E. Roberts,* Salt Lake City, for respondent.

WOLFE, Justice.

Appeal by the defendant from a verdict and judgment for the plaintiff in the amount of $50,000.00 for the death of Gerald D. Thomas, an employee of the defendant, who was killed during the course of his employment as a brakeman. This action is brought under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., and the Safety Appliance Act, 45 U. S. C. A. § 1 et seq.

The facts out of which this case arises are as follows:

The fatal accident occurred at Sunnyside, Utah, on October 11, 1947. Sunnyside is located in rather a wide canyon running in a generally northerly and southerly direction. Two parallel sets of track, known as the main line track and the load track, run up and down the canyon, in addition to connecting storage and switch tracks. At the upper end of the canyon near the town of Sunnyside is located a tipple where coal is loaded into railroad cars. Some two thousand feet south of the coal tipple, a switch track known as the "bin track" branches off from the load track and runs in a southeasterly direction along the canyon hillside for about 3,000 feet. At the southern end of the bin track is a large box-like coal bin 198 feet in length, owned by the Utah Fuel Company and used for the storage of slack coal. The slack coal is used for fuel in the nearby coke ovens of the Utah Fuel Company. Standard guage railroad track runs along the top of the bin structure as a continuation of the bin track. The bin track approaches the bin over a wooden trestle 43.6 feet long. At the south end of the bin and bin track, a bumper device was installed prior to the accident. The railroad tracks curved upward and inward to a point on the bumper.

The accident to Thomas occurred when two loaded cars of coal were being "dropped" from a position on the load track just north of and above the switch leading to the bin track, through the switch and onto the bin track and along the bin track out to the bin. Thomas, the head brakeman of the train crew, mounted the brake platform of the lead or most southerly of the two cars. In "dropping" these two cars to the bin, it was Thomas' job to regulate and control their speed by means of the Ajax brake on the car he was riding and to bring the cars to a stop when the cars had reached the desired spot on the bin. The total distance to be traveled by the cars from their position north of the bin track switch to their intended position on top of the coal bin was more than one-half mile. The

grade of the bin track for about the first 300 feet was 3.5%, then for about the next 500 feet the grade tapered off from 3.5% to 0.5%, and for the remaining 2200 feet to the coal bin the grade was approximately level. The grade enabled cars to roll from their position on the load track onto the bin track and out to the coal bin by gravity. Although the grade of the bin track slackened appreciably after the first 700 to 800 feet, application and regulation of a brake on loaded cars was necessary to bring the cars to a stop on the bin.

The two cars were ridden towards the bin by Thomas as planned, but instead of being stopped on the bin as intended, the cars continued on over the south end of the bin structure and fell 34 feet to the ground below. Afterwards, Thomas was found in the wreckage of the cars at the base of the bin. He was unconscious and had sustained injuries from which he died a few hours later in the hospital at Dragerton, Utah, without regaining consciousness.

The complaint filed by the plaintiff alleged that the defendant was responsible for the death of Thomas by reason of its negligence in each of the following particulars:

(a)  That defendant used and adopted a dangerous and unsafe method to place cars on the coal bin, in that, instead of using a locomotive to control the speed of cars as they were moved onto the bin, the cars were placed in motion and Thomas was required to control their speed and momentum by means of the hand brake which was insufficient for that purpose.

(b)  That defendant violated the Safety Appliance Act in using and hauling on its tracks a car not equipped with a sufficient hand brake, to wit, the hand brake on the lead car of the two cars loaded with coal; that as a result of the insufficiency of the hand brake, it was impossible for Thomas by use of said brake in the usual, ordinary and proper manner to control the speed of the cars or to bring them to a stop on the bin.

(c) That defendant failed to provide Thomas with a safe place to work, in that, he was required to ride the cars loaded with coal in reliance upon the hand brake of the leading car to control the cars and bring them to a stop on the coal bin, without making the coal bin safe for an eventuality such as occurred, in that no bumper timbers or bumper devices were placed at the end of the bin for the purpose of stopping cars whose speed or momentum had not been otherwise controlled.

(d) That defendant negligently planned its work incident to the moving of the two cars loaded with coal onto the bin, and negligently built and constructed the bin so as to cause a hazardous situation to exist.

Each and all of the foregoing grounds of negligence were denied by the defendant, and by way of affirmative defense the defendant alleged the contributory negligence of the decedent as a proximate cause of the accident.

The case was submitted to the jury on all of the four grounds of negligence alleged in plaintiff's complaint. The jury returned a verdict of $50,000.00 with no deduction for contributory negligence. Judgment was entered on the verdict, and from that judgment defendant appeals.

The point first argued by defendant in its brief, and the point most strongly relied upon for reversal, is that there was no evidence of any violation of the Safety Appliance Act, and that issue should not have been submitted to the jury. The evidence respecting this question is as follows:

Ernest E. Barnes, the conductor of the train crew on which deceased was working at the time of the accident, a witness for the plaintiff, testified as follows:

He had worked at Sunnyside as a conductor and as a brakeman for short periods at various times from 1936 up to the date of the accident. He had been working there for about five days just prior to the accident to Thomas. During the periods that Barnes had worked at Sunnyside,

no particular custom or method was used by switching crews in taking loads of coal from the load track onto the bin track and spotting them on the coal bin. On occasions, the loaded cars would be dropped and spotted by gravity directly from the load track to the bin. In so doing, the movement usually was started above the bin track. A brakeman would release the hand brakes and ride the cars to the bin. The cars were controlled by means of the hand brakes. When cars were dropped, the speed usually would be attained during the first 500 or 600 feet due to the steeper grade on that portion of the bin track. Thereafter the grade of the track was comparatively level all the way to the bin.

On the morning of October 11, shortly before the accident, the switch engine had been derailed. Barnes told Schauster and Thomas, the two brakemen, that the two loaded coal cars would be dropped onto the bin. Thomas got on the brake platform of the first of the two cars, that is, the lead car or the one furtherest down hill.

"The brake on this car was an Ajax brake, which is a power brake. It is a very good brake. You don't have to use a brake club on it; it is strictly a hand brake."

The cars were standing with their brakes set and the brakes were holding properly. At the point where the cars were then standing, there was a fairly steep grade. Barnes observed that the brakes on the two cars going to the bin were operating and holding the loaded cars on the grade. After Thomas got on the brake platform at the front end of the lead car, Schauster got on the second car. Schuaster released the brake on his car first. The two bin track cars then were disengaged from the other cars in the cut. The two cars then were being held on the grade merely by the one brake on the end of the lead car that Thomas was riding. This one brake properly was holding the two cars on the 3% grade. Thomas then released the brake and the two cars started to roll toward the bin track.

After Thomas had started down the bin track with the two cars, Schauster and Barnes proceeded to drop the two remaining cars of the cut down toward the storage track. As Barnes was riding the remaining cars into the storage track, he noticed the two cars on the bin track when they were from 400 to 600 feet from the bin, and he remarked to Schauster, "I believe they are going too fast." Barnes was apprehensive so he continued to watch. At the one-half mile distance he was from the cars on the bin track, Barnes would "guess" the cars were going anywhere from 8 to 10 miles per hour. Barnes could not state how fast the cars were moving as they moved across the wooden trestle on the approach to the bin. Later on redirect examination, Barnes said that when the cars approached the bin they possibly were not moving over 5 or 6 miles per hour. Barnes didn't "imagine" the cars were going over 4 miles per hour when they got onto the bin and were passing the sign on the bin (located 50 feet from the end of the bin). At that speed, in Barnes' opinion, the cars could have been stopped "most any time, within a couple of car lengths." Barnes kept watching the cars. He could see the cars were still moving at a slow rate of speed. He saw the cars hit the incline or bumper device at the end of the bin, and the lead end of the car raised up very slowly. It seemed that this incline broke away and the cars pitched right off the bin into the ground. At no time during the period that Barnes watched the cars move could he see Thomas. He did not know whether or not Thomas ever applied the brakes.

Schauster was also called as a witness for the plaintiff, and testified as follows:

In the regular course of his duties on October 11th, Schauster knew that either he or Thomas was going to ride the cars to the bin. Nobody specifically told them to do this; it was just part of their ordinary duties. They took it as a matter of course. When he and Thomas walked toward the two cars, Schauster said to Thomas, "Jerry,

get the pin and release the hand brake. I will ride these cars to the bin." Thomas replied, "No, I will drop them; you get the pin." Thomas then stepped up to the brake platform of the lead car and Schauster went to the rear of the two cars. Schauster pulled the pin between the two bin cars and the other two cars of the cut, and then got up on the platform of the end brake of the second car. Schauster released the brake on his end of the second bin car. The two cars continued to stand on the grade held by the one brake applied on Thomas' end of the lead car. At that time, the brake on the front end of the lead car was functioning properly. Thomas gave Schauster a signal that he was ready to move and Barnes also gave a signal. The cars were still standing there as Schauster proceeded to get down from the car he had been on. Thomas then released the brake on the end of the car he was riding, and the cars started to move into the bin track.

Schauster and Barnes next took the two remaining cars down to the storage track. As they were dropping these two cars, Barnes remarked to Schauster, "I believe he is going a little fast." When Schauster looked in the direction of the bin track, he saw the two cars approaching the bin. The cars were four or five car lengths north of the bin. At that time, Schauster would estimate the speed of the cars at 7 or 8 miles per hour, but he didn't know exactly the speed. He merely estimated the approximate speed from his position one-half mile away from the cars. Schauster continued to watch the cars. They appeared to be slowing as they went by a stationary white sign located at the approach to the trestle of the bin. At that point, Schauster would estimate the speed of the cars at 3 to 4 or possibly 5 miles per hour. The cars moved past a second sign which read "Cars Must Not Pass This Point," and went on over the end of the bin. Schauster could not see Thomas on the cars. He did not know what, if anything, Thomas did about the brakes.

Silas A. Ross, an employee of the Utah Fuel Company, was an eye-witness to the tragedy. He testified for the defendant as follows:

Ross was able intermittently, to see the two cars coming down the bin track as they approached the bin. He first noticed the brakeman, Thomas, as the cars entered the trestle approach to the bin, at which time their speed was estimated to be 12 to 15 miles per hour. Thomas was standing on the brake platform, with his hand on the brake wheel in the prescribed position, his head facing toward the bin in the direction the car was moving.

When the cars first entered onto the bin, they momentarily passed from Ross' view, but next came into view after they had passed the sign on the bin marked with the inscription "Danger. Cars Not To Be Dropped Beyond This Point." This sign is located 50 feet from the end of the bin. As the cars passed the "danger" sign, Ross saw Thomas standing on the brake platform leaning over the brake wheel, but Thomas was not working the brake when the cars first came into view at this point. Thomas then glanced over his shoulder at the danger sign, and "after he passed the danger point, he applied the brake." At that time, the cars were traveling at an estimated speed of 8 to 12 miles per hour. It appeared to Ross as though Thomas stepped down on the coupling of the car, in order to get clear of the cars. Ross saw the cars for the last time after they had passed the "danger" sign. They seemed to stay at the same speed of 8 to 12 miles per hour. He did not actually see the cars go over the end of the bin.

Arnett W. Dodds, an employee of the Utah Fuel Company, testified for defendant as follows:

He was driving his automobile along a road running roughly parallel to the bin track and about 325 feet therefrom. He observed the two cars coming down the bin track, and observed that they were coming unusually fast. He was able to see Thomas standing on the brake platform.

Thomas was not doing anything with reference to the brakes. He was just riding along, holding onto the brake wheel.

Alfred G. Martin, a general car foreman in the employ of the defendant, testified that he was familiar with the Ajax brake, its operation and construction. On the evening of the day of the accident, he examined the cars that had fallen over the bin. He examined all of the parts of the brake, except those parts which were buried under the coal. No part of the brake rigging was torn up or destroyed. No parts of the brake were broken or missing. The following day, after the coal had been cleared away, he inspected the brake, brake housing, and brake wheel and found them all "OK." He did not find any defect or imperfection in the brake mechanism.

Martin also examined the wheels of the car on which Thomas had been riding. He did not discover any flat pieces or spots on these wheels, nor any indication that the wheels of the car had slid at any time. Nor was there any indication on the brake shoes that the brakes had been applied with sufficient force to slide the car wheels.

In the recent case of *Myers* v. *Reading Co.*, 331 U. S. 477, 67 S. Ct. 1334, 91 L. Ed. 1615, the U. S. Supreme Court announced the rule as to the methods of showing that a hand brake is "inefficient" within the meaning of the Safety Appliance Act. The court quoted with approval from *Didinger* v. *Pennsylvania R. Co.*, 6 Cir., 39 F. 2d 798, 799, as follows:

"There are two recognized methods of showing the inefficiency of hand brake equipment. Evidence may be adduced to establish some particular defect, or the same inefficiency may be established by showing a failure to function, when operated with due care, in the normal, natural and usual manner." [331 U. S. 477, 67 S. Ct. 1338.]

Clearly, there is no evidence of a particular defect in the brake in question. The only testimony regarding the

condition of the brake, and its various parts, is all to the effect that it was in good condition.

As to the functioning of the brake, the evidence is undisputed that it was functioning properly at the time that the "dropping" operation was commenced, at least to the extent that it held two freight cars loaded with coal on a 3% grade. It is likewise undisputed that the two cars approached the coal bin "too fast" and that they were not stopped in time, and crashed over the end of the bin. The failure of the two cars to stop at the designated place could have been caused by either of two factors: (a) inadequacy of the brakes to stop the two loaded cars within the required distance; or (b) failure of the brakeman to apply the breaks at all, or to apply them properly, or to apply them timely. In short, the cause of the tragedy was either a mechanical failure or a human failure.

The Supreme Court of the United States in *Lavender* v. *Kurn*, 327 U. S. 645, 66 S. Ct. 740, 744, 90 L. Ed. 916, stated in F. E. L. A. cases,

"only where there is a complete absence of probative facts to support the conclusion reached [by the jury] does a reversible error appear."

The plaintiff contends that there are probative facts to support the conclusion that Thomas made a timely application of the brake on the car he was riding, but that the brake failed to stop the cars. If the record were silent as to the activity of the deceased as the cars moved across the trestle and onto the bin, the presumption that Thomas took such steps as were necessary to carry out the duties imposed upon him and to preserve his own safety might perhaps be indulged in. Thus with the aid of that presumption, the jury could conclude that Thomas' death was due to a mechanical failure of the brake. However, in view of the testimony in the record that Thomas was not applying the brake when observed by the several witnesses, no such presumption exists to aid the plaintiff's cause.

No one observed Thomas at every point along the 3000 feet of track, but all the witnesses were impressed by the fact that the cars, when observed by them, were traveling "too fast." Dodds testified that when he noticed the cars they were traveling at an estimated speed of between 25-30 m. p. h. and that Thomas was standing on the brake platform of the lead car doing nothing with reference to the brakes, but was just riding along holding onto the brake wheel. Neither Schauster nor Barnes were able to see whether Thomas was making an application of the brake at any point along the track. Ross who was in the best position of any of the witnesses to observe, noticed Thomas standing on the brake platform prior to the time the cars entered onto the trestle approach to the bin and again just as the cars entered the trestle approach. He testified that Thomas at both of these times was standing on the brake platform but was apparently making no attempt to apply the brake. Then the cars were momentarily obscured from Ross' vision, but when they next came into view, fifty feet from the end of the bin, Thomas was leaning over the brake wheel, but apparently was not working the brake. Thomas then glanced over his shoulder at the danger sign and applied the brake.

The presumption that Thomas was engaged in the performance of his duties and in the exercise of due care for his own safety at the time of his death has not come into being because the evidence that Thomas at every point where observed, was making no attempt to apply the brake until within fifty feet of the end of the bin. At that time it was too late to stop the cars in the remaining distance even if the brake were in perfect working order. We have not overlooked the fact that as the cars travelled across the trestle and onto the bins, there was a certain space of time in which neither Ross nor any other witness could tell whether Thomas made an attempt to apply the brake. Nor have we failed to take cognizance of the fact that Ross testified that after Thomas applied the brake when less

than fifty feet from the end of the bin, the cars did not appear to lose speed. Despite these two factors the presumption contended for by the plaintiff does not come into play. Had Thomas applied the brake during the short time when he was not visible to Ross and had the brake not functioned, Thomas would have doubtless continued to work the brake wheel in an effort to get braking power. But when Thomas again came into view to Ross, Thomas was leaning over the brake wheel and it was not until Thomas turned his head and observed the danger sign, that Ross was able to notice any attempt to apply the brake. The fact that Ross did not observe any decrease in the speed of the cars after Thomas applied the brakes has no probative value as Ross continued to watch only a few seconds and then he left the scene to avoid exposure to high tension wires which he feared might fall if the cars went over the end of the bin. Furthermore, if the cars were travelling from 12-15 m. p. h. when they were three car lengths away from the end of the bin, as testified to by Ross, the loss of speed in but fifty feet would be slight. As heretofore stated, an examination of the brake shoes did not reveal any indication of a forceful application of the brake.

We conclude, therefore, that there can be no presumption that Thomas was at all times engaged in the performance of his duties and acting to preserve his own safety. Hence, there are no probative facts nor inferences from facts from which it could be concluded that Thomas made a timely application of the brake and that the brake failed to function, and thus the trial court erred in submitting the issue of the insufficiency of the hand brake to the jury.

Defendant also contends that there was absolutely no evidence to support plaintiff's allegation that

"no bumper timbers or bumper devices were placed at the end of said trestle for the purpose of stopping cars * * *"

It will be noted that the allegation is not that the bumper device was inadequate for the purpose intended, but rather that there was no bumper device at all.

Plaintiff's own evidence establishes the existence of a bumper device consisting of an elevation of the track at about a 30° angle. It was braced by 12″x12″ timbers. The tracks along the top of the bin were curved up and into a point on the bumper device. No evidence was offered as to the type of bumper devices generally in use on tracks of this sort, nor as to the maintenance or inspection of this particular device. Nor was there any evidence as to the amount of momentum this bumper device was built to withstand, nor any evidence as to the amount of momentum it would ordinarily be expected or required to withstand. There is no dispute as to the bumper device having been destroyed by the accident.

Plaintiff's own evidence established quite clearly the existence of a bumper device. Whether or not it was a reasonably safe and efficient bumper device is a different matter. Proof that a given piece of equipment failed under a given set of circumstances does not prove ■ the nonexistence of such a piece of equipment. If plaintiff had intended to rely on the inadequacy of the bumper device or upon improper maintenance of it, he should have pleaded and proved it. Manifestly there was no evidence of absence of a bumper device. On the contrary, the record conclusively shows the existence of such a device, and the trial court erred in submitting that issue to the jury.

Defendant further contends that there is no evidence to support plaintiff's allegation that defend- ■ ant negligently "planned its work" and

"so negligently * * * built and constructed its said trestle as to create and cause a dangerous and hazardous situation * * *"

The evidence seemed directed to proving a negligent manner of transporting the coal cars to the bin in that

a locomotive was not employed to control the speed and momentum of the cars as they moved out onto the bin, and in sending one man unfamiliar with the method adopted on the two cars. It may be that this type of negligence can be spelled out of allegation (d) that the defendant negligently planned its work, but we have difficulty in seeing how the construction of the trestle created a hazardous situation. The whole grade may have made it dangerous to approach the trestle in the manner used, but the trestle did not collapse and in itself presented no dangerous situation as far as this work was concerned. However, the negligence alleged in allegation (a) as to the unsafe method adopted is specifically definite to cover this phase of the case although there is no allegation therein that there was negligence in sending only one man on the two cars who was unfamiliar with the use of the method employed over that grade. We think it is unnecessary to pass on the question of whether such has been assigned as negligence since reversal of the case will permit such amendments as the parties may desire to make.

One further point must be noted. Defendant, in its amended answer, filed a claim for set-off in the amount of $4,923.98, alleging that defendant had contributed certain sums to the Treasury of the United States for the benefit of its employees upon their retirement or for the benefit of the immediate dependents of such employees in the event of the death of employees before their retirement; that on account of the death of Gerald D. Thomas, his dependent widow and minor children had received or were entitled to receive from the contributions so made by the defendant, certain annuity payments; and that defendant had contributed one-half of the sums payable and defendant therefore was entitled to a set-off of an amount equivalent to one-half of the present value of such annuities.

This claim of set-off was based on Sec. 5, of the F. E. L. A., 45 U. S. C. A. Sec. 55, which reads as follows:

"*  *  * That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein *any sum it has contributed or paid* to any insurance, relief benefit, or indemnity *that may have been paid* to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought." (Italics added.)

A demurrer to this set-off was sustained and on motion of plaintiff it was stricken. Defendant assigns this as error.

The set-off pleaded by defendant did not come within the authorization of the statute. The statute authorizes a claim of set-off in "any sum it [carrier] has contributed or paid  *  *  *." Defendant here sought to recover not the amount it had contributed, but the amount which the heirs were entitled to receive by reason of the contribution. Also the statute authorizes set-off of only those sums "that may have been paid to  *  *  * the person entitled thereto." Defendant alleged that the widow and children of deceased "had received *or were entitled to receive*" certain sums. The claim of set-off interposed by defendant went beyond the scope of contemplation of the statute and was properly stricken. *Hetrich* v. *Reading Co.*, D. C., 39 F. Supp. 22.

Other errors have been assigned, but they involve questions not apt to recur on a retrial, and we, therefore deem it unnecessary to consider them.

For the reasons heretofore stated, the judgment is reversed and remanded for a new trial. Costs to appellant.

WADE, LATIMER and McDONOUGH, JJ., concur.

PRATT, Chief Justice.

I concur except as to the result which I believe should be a dismissal of the case on its merits.