Walter A. EICHEL, Plaintiff-Appellee,

v.

NEW YORK CENTRAL RAILROAD COMPANY, Defendant-Appellant.

No. 359, Docket 27991.

United States Court of Appeals Second Circuit.

Argued May 8, 1963.

Decided June 20, 1963.

Jerome H. Shapiro, Gerald E. Dwyer, New York City (Edward J. Murphy, New York City, of counsel), for appellant.

Richard C. Machcinski (Zelenko & Elkind, New York City), for appellee.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Plaintiff, Walter A. Eichel, who had been employed by defendant New York Central Railroad Co. for 40 years, brought two actions against it in the District Court for the Southern District of New York under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60, which were consolidated for trial. The first alleged two separate injuries—one on September 17, 1957, when Eichel, while serving as assistant conductor on a passenger train, allegedly injured his left hip by being thrown against a steel door jamb when the train suddenly gave a series of jolts and lurches, and another on March 13, 1959, when, while serving as road freight conductor on a traveling switcher, he allegedly was subjected to undue strain in attempting to operate a defective coupler and sustained an injury to his left groin, resulting in a hernia for which he underwent surgery. The second action alleged a third injury, on December 13, 1960, when plaintiff, while serving as a freight brakeman and standing on top of a moving boxcar, allegedly re-injured his left hip as the result of being thrown off his feet when the train came to a sudden stop. Eichel lost no time from work as a result of the 1957 accident, but was out four months owing to the groin injury and hernia in 1959, and had not worked at all since the 1960 accident, by which he claimed to have been permanently disabled.

■ Trial took place late in 1962 before Judge Foley, of the District Court for Nevada, and a jury, and consumed the greater part of seven days. The jury brought in special verdicts for defendant on the 1957 injury, for plaintiff in the sum of $5,500 on the 1959 injury, and for plaintiff in the sum of $51,500 on the 1960 injury. Defendant has satisfied the portion of the judgment relating to the 1959 injury and does not contest it; plaintiff has not appealed from the judgment on the 1957 injury. We have before us only defendant's appeal from the judgment on the 1960 injury. Defendant's position is that, so far as the finding of liability is concerned, it "recognizes the restricted scope of review of a jury verdict in Federal Employers' Liability Act cases when there has been a trial proper in all respects and is not presently seeking dismissal." It contends, however, that the trial was affected by two errors calling for reversal: (1) the $51,500 verdict was grossly excessive in the circumstances and should shock the conscience of the Court; and (2) the District Court committed prejudicial error in excluding evidence—offered by defendant for the purpose of impeaching plaintiff's testimony as to his reasons for not going back to work—that plaintiff was receiving a disability pension in the amount of $190 a month. We find merit in defendant's second point and accordingly reverse and remand for a new trial, limited, however, to the issues of injury and resulting damages; we affirm the judgment as to the determination of negligence.

The evidence as to the circumstances of the accident came solely from Eichel. He testified that about 9:30 p. m. on December 13, 1960, he was serving as the rear end brakeman on a train crew which, with an engine and a caboose, was switching cars in and about an industrial siding near Elmsford, N. Y. In addition to the engine and caboose, the train being maneuvered at the time consisted of eight empty boxcars; these were to be pushed in a southerly direction by the engine which was coupled next to the caboose at the northerly end of the train. Having dropped off the train to close a switch, Eichel got back on and climbed a ladder to the top of the boxcar at the front, or southerly, end; he took a position there for the purpose of observing the track ahead and, if necessary, signaling the engineer to stop. He stood in the center of the car on the running board provided for that purpose; it had serrated edges designed to provide a good grip for the trainman's boots. Looped

over his forearm was a small electric lantern that he used for signaling. The train started up and had moved approximately one full length, going at about five miles per hour, "when suddenly the train stopped and I was thrown upwards in the air and my feet up and I landed on my left hip." Eichel attributed the suddenness of the stop to the engineer's negligent use of the straight valve, which operates the air brakes in the engine alone, rather than the automatic valve, which operates them throughout the train. After the stop the train resumed movement to the south and Eichel, after "rolling around on that roof of the car," eventually managed to get to his feet. He subsequently signaled the engineer to stop at a crossing and, having climbed down with difficulty, told him to stop again at the Elmsford station, which was just ahead and just short of the crew's immediate destination. At the station Eichel got off and reported his injury to the agent on duty; he remained inside while his fellow crewmen were running the train around so as to place the engine at the front rather than the rear end. When this had been done and the crew members joined him in the station, he told them of his injury; he then rode in the caboose as the train returned to the Bronx, where it stopped specially to let him off near his home. He slept very little that night and in the morning consulted the company physician and was admitted to a hospital, where X-rays were taken and he stayed for a week; after leaving the hospital he underwent further X-rays and treatments.

On cross-examination, Eichel admitted that the train might have been moving as slowly as four or even three miles an hour; that he had previously testified on deposition that the train only "practically" came to a stop; that a railroad rule required a brakeman in a switching operation to expect stops at all times and protect himself accordingly; that his alleged fall did not break the lantern or dislodge it from his arm; that he said nothing about the accident to the engineer when the train stopped at the crossing (where it would have had to stop anyway); that on several previous occasions his left hip, as the result of either the 1957 injury or a concededly pre-existing arthritic condition, had suddenly given way and caused him to fall—an experience which defense counsel suggested might have been repeated on the top of the boxcar; and that he had originally falsified his age to obtain his job with defendant back in 1920. The railroad did not call any witnesses of its own as to the circumstances of the accident; in particular, it failed to call the other members of the train crew, although all of them, including the engineer, were present in court and had been instructed by the judge, at the railroad's request, to remain available to testify.

On the issue of damages, it was conceded that at the time of the accident Eichel was earning $7,951.52 a year in defendant's employ; that he was then almost 58 years old and thus had a little more than seven years remaining before the compulsory retirement age of 65; that he had not worked at all since the accident; and that he was single and had never been married. Concerning the extent of the injury suffered, Eichel testified that his left hip had been "constantly painful" since; that the pain caused him to wake up "three, four, five times during the night"; and that he did not have the proper use of his left leg. Although conceding that even before the 1960 accident he had been limping, had had pain in his left hip, and had occasionally fallen, he claimed that "the pain is much more severe [now] and I don't have the freedom of my leg at all." His medical expert, who had examined him before and after the 1960 accident, testified that, although the before-and-after X-rays disclosed no notable change in the condition of the left hip, the expert's conclusion in 1961 had been that "the injury which he sustained on December 13, 1960 had markedly aggravated the symptoms * * *." Defendant's medical witness, as might be expected, gave more weight to the X-rays and testified that "None of these accidents aggravated the osteoar-

thritis of the hip." On the question of Eichel's ability to work, his medical witness testified to having concluded, upon examining plaintiff in January, 1961, that the 1960 accident "had disabled him from returning to work," and said also that "I don't see how he would have been able to engage in any manual labor that required him to be on his feet, such as a brakeman or moving about in a railroad yard or on a train.' In addition, Eichel introduced the reports of two other doctors who had examined him in January, 1961, and described him as "completely disabled." Defendant's medical witness, on the other hand, testified that upon examining Eichel in August, 1961, "I stated that this patient might be given work at floor levels * * *. And I further said that this man should adapt himself to work which does not require climbing or standing on top of moving cars." Eichel himself testified that he had not worked since the accident "because of the pain in my hip" and because "I don't have the proper use of my leg." He admitted under cross-examination, however, that he "could do some work" if it was "ground level work where I wasn't required to lift or climb or push things, or work long hours in all kinds of weather," and also that he had not attempted to get any such work either from the railroad or from another employer. It was further brought out that Eichel occasionally rakes leaves and cuts grass around his house; that he drives a car (with an automatic clutch), and in his application for a 1962 driving license renewal stated that he had no physical disability; and that he went hunting on one occasion in the fall of 1962 (although plaintiff claimed this amounted to merely "sitting in the woods").

It was in connection with this issue of Eichel's ability to work and his reasons for not working that defense counsel sought to introduce evidence of the pension payments. These were in the amount of $190 a month and had been awarded under the Railroad Retirement Act of 1937, 45 U.S.C. §§ 228a—228z-1. That Act would have made a "retirement" pension available to Eichel in any event upon his compulsory retirement at the age of 65 (§ 228b(a)1)—or even, in view of his more than 30 years' service, if he chose to retire at 60, although the amount would then be reduced (§ 228b (a)3)—but in this case the pension was presumably awarded under § 228b(a) 4, which applies to railroad employees "whose permanent physical or mental condition is such as to be disabling for work in their regular occupation, and who (i) will have completed twenty years of service * * *."[1] The purpose for which the evidence was offered was, as defendant's counsel expressed it during a long colloquy that ensued (in the absence of the jury) when the question was first raised, "to impeach the testimony of this witness as to the permanency of his injuries * * *. I can show that this man decided, notwithstanding this condition of aggravation which he claims, * * * when he found out that he could get and was getting the $190 a month disability pension, then he decided to take off, your Honor, go hunting, drive the automobile around, and not return to work * * *." The court ruled the evidence inadmissible and adhered to this ruling, despite some apparent wavering,

---

1. The statute further provides that "An individual's condition shall be deemed to be disabling for work in his regular occupation if he will have been disqualified by his employer because of disability for service in his regular occupation in accordance with the applicable standards so established; if the employee will not have been so disqualified by his employer, the [Railroad Retirement] Board shall determine whether his condition is disabling for work in his regular occupation in accordance with the standards generally established * * *. Such satisfactory proof shall be made from time to time as prescribed by the Board, of the disability provided for * * * and of the continuance of such disability * * * until the employee attains the age of sixty-five. * * * If before attaining the age of sixty-five an employee in receipt of an annuity under * * * this subsection is found by the Board to be no longer disabled * * * his annuity shall cease * * *."

when defense counsel subsequently reopened the argument after plaintiff had admitted on cross-examination that he could do some work, and again in connection with a requested charge.

 It is clear, and defendant has never disputed, that plaintiff's disability pension payments, coming not from the tortfeasor but from a collateral source, were not admissible for the purpose of being set off, in the calculation of damages for lost earnings, against the sum that would otherwise have been awarded. "The Railroad Retirement Act is substantially a Social Security Act for employees of common carriers. * * * The benefits received under such a system of social legislation are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer." New York, N. H. & H. R. R. Co. v. Leary, 204 F.2d 461, 468 (1 Cir.), cert. denied, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 370 (1953); accord, Sinovich v. Erie R. R. Co., 230 F.2d 658, 661 (3 Cir. 1956); Page v. St. Louis S. Ry. Co., 312 F.2d 84, 94 (5 Cir. 1963).[2] It is a familiar principle, however, that "the inadmissibility of an evidential fact for one purpose does not prevent its admissibility for any other purpose otherwise proper," 1 Wigmore, Evidence (2d ed. 1940), at 711; in such a situation, "the normal practice is to admit the evidence" and to protect the adversary by "an instruction that the jury is to consider the evidence only for the allowable purpose." McCormick, Evidence (1954), at 136; see 1 Wigmore, supra, § 13.

This Court's most recent decision on the admissibility of evidence of Railroad Retirement Act pensions in F. E. L. A. cases is Murray v. New York, N. H. & H. R. R., 255 F.2d 42, 45 (2 Cir.1958). There, in reversing a plaintiff's judgment for error in excluding certain evidence tending to show contributory negligence, we addressed ourselves also to the defendant's contention that the court had erred in preventing defense counsel from arguing to the jury "that at age 65 the plaintiff would be entitled to retire with full pension," and in refusing to charge that the jury "might consider the plaintiff's pension rights in trying to calculate the amount of his lost future earnings." We held that at the new trial evidence of the plaintiff's pension rights would be admissible, since they "were relevant to a determination of his probable lost future earnings [,] * * * to the question of whether he might retire in the future, and hence not suffer a loss of earnings attributable to his injury." Appellee would distinguish the Murray case, and others like it, on the ground that the pension involved there was the "retirement" pension that becomes available at age 65 under § 228b(a)1; that the plaintiff there would not have been compelled to retire at 65 and was claiming lost earnings past that age; that in calculating the lost earnings due to the injury, it was obviously relevant to consider whether he would have retired at 65 voluntarily in the absence of the injury; and that the answer to this question would depend, as said in Murray, "upon whether he would find it advantageous to do so, and this, in turn, would depend in part on a determination of the amount of the pension to which he would be entitled." The present case is differ-

2. This is true of the disability pension payments here even though they are contributed to by the railroad under the Railroad Retirement Tax Act, 26 U.S.C. § 3221, and even though § 5 of the F.E. L.A., 45 U.S.C. § 55, provides that "in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought." New York, N. H. & H. R. R. Co. v. Leary, supra, 204 F.2d at 467–468; Hetrick v. Reading Co., 39 F.Supp. 22 (D.N.J.1941); see King v. Denver & Rio Grande W. R. R., 116 Utah 488, 211 P.2d 833, 839–840 (1949). But see McCarthy v. Palmer, 113 F.2d 721, 723 (2 Cir.), cert. denied, 311 U.S. 680, 61 S.Ct. 50, 85 L.Ed. 438 (1940), (dictum, by implication).

ent, appellee contends, because here retirement at 65 was compulsory and plaintiff made no claim for lost earnings past that age,[3] and because the pension at issue here is the "disability" pension being paid to plaintiff under § 228b(a)4, which, rather than being relevant as tending to reduce the income that he would have had in the absence of the injury, would not have been paid in the absence of the injury.

Granting that the evidence here did not have precisely the same thrust as in Murray,[4] we think it was nevertheless relevant and admissible under the rationale of that decision. Plaintiff claimed that his total loss of wages up to age 65 was due to the injury received in the accident; but the X-rays showed no change from his pre-accident condition, and he admitted that he could do "ground level" work and had not sought any, that he drove a car with a nondisability license, raked leaves, mowed grass, and hunted. It was defendant's theory that plaintiff was a malingerer; that being a bachelor with relatively small financial needs, he chose to refrain from renewed earnings and to live off his pension—if not permanently, at least until the trial in the hope of obtaining a larger verdict. If accepted by the jury, this theory would have afforded a proper basis for reducing the recovery, since at least a part of plaintiff's past and prospective loss of earnings would not have been, in the words of the Murray opinion, "attributable to his injury," but rather to his voluntary decision to abstain from work. Eichel's receipt of the pension payments, which enabled or at least helped him to support himself while not working, not only tended to increase the probability of defendant's theory that he had deliberately increased his damages, but was an essential link in it; indeed, receipt of the payments had some bearing on the question whether Eichel had received any further injury at all in 1960, or was merely feigning one. The evidence was therefore relevant and admissible.

This conclusion is supported by the cases in other circuits. Simmons v. Union Terminal Co., 290 F.2d 453 (5 Cir. 1961), also involved a railroad worker's disability pension, and admission of the evidence to impeach the plaintiff upon cross-examination was upheld. In Page v. St. Louis S. Ry., 312 F.2d 84, 94 (5 Cir.1963), as in Murray, the pension was of the retirement variety (although since the plaintiff was over 65 at the time of the accident the difference was academic), and admission of the evidence was held proper where the plaintiff "had testified that he was not working because of disability resulting from the accident," and "[t]he defendant claimed that the plaintiff was malingering"; the court stated the basis of relevancy as being "for the purpose of permitting the jury to determine whether plaintiff retired because of his injuries or because of his age or other factors disassociated from the accident"—a statement which seems quite applicable here if plaintiff's alleged attempt to induce a large verdict and his

---

3. The jury was instructed, if it found liability, to include in its award of damages "such sum as will compensate the plaintiff reasonably for any loss of future earning power occasioned him by the damage in question, and from which he is reasonably certain to suffer in the future up to the time he is compelled to retire at the age of 65."

4. Defendant's contention, both in the District Court and here, has been for the admissibility in evidence of the "disability" payments; it is true that evidence of "retirement" payments to become available at 65 would be irrelevant where, unlike the situation in Murray, lost earnings beyond that age are not claimed. We see no reason, however, why defendant should not be able to introduce here, under the ruling of Murray, evidence of the reduced retirement payments to which this plaintiff, by virtue of his more than 30 years' service, would be entitled at age 60 under § 228b(a)3. This theory would seem to have been comprehended within defendant's requested charge that the jury might consider "evidence of retirement benefits to which plaintiff is or will be entitled in determining the period that plaintiff would have continued to work if he had not been injured."

receipt of the disability pension are considered factors "disassociated from the accident," as of course they should be for the purpose of assessing damages against defendant. Similarly, in Reiner v. Northern Pac. Terminal Co., 259 F.2d 438, 441–442 (9 Cir.1958), admission of evidence of a retirement pension to impeach the plaintiff on cross-examination was upheld, the court explaining that "Appellant here contended that he was completely incapacitated by reason of the accident and could not work. Appellee is endeavoring to show by way of impeachment that the reason he didn't work was not because of the accident, but because he was retired."

Of the cases cited by appellee, A. H. Bull S. S. Co. v. Ligon, 285 F.2d 936, 88 A.L.R.2d 479 (5 Cir.1960), to the extent that it survives the same Circuit's Simmons and Page decisions, seems distinguishable here, especially in the light of its own caveat that "there may be cases where evidence of this kind should be admitted." The evidence of social security and veterans' pension payments that was held to have been properly excluded there had been offered solely on the basis that it showed a motive for abstention from work because the payments would be cut off or reduced if the plaintiff's earnings exceeded a certain amount per year, and the court's affirmance of the exclusion was based solely on the proposition that such an inference was unreasonable where the amount of earnings required to work a forfeiture of the payments was two or three times what the plaintiff was actually earning. Sinovich v. Erie R. R. Co., 230 F.2d 658 (3 Cir.1956), reversing what the plaintiff claimed to be an inadequate judgment because of the allowance of a question as to receipt of a disability pension, is also distinguishable. The defense there was that the plaintiff's condition was due to a pre-existing disease rather than to the accident, the defendant apparently not disputing the plaintiff's testimony that he was quite unable to work; emphasizing that this issue had not been contested, and that plaintiff had said nothing on direct which would be contradicted by the pension evidence, the court found it "difficult to understand the purpose of the query unless it was to convey to the jury that plaintiff had in fact been pensioned off by the railroad for disability even though his major trouble was in nowise attributable to the accident." Flener v. Louisville & N. R. R. Co., 198 F.2d 77 (7 Cir.1952), which held references to the plaintiff's disability pension "immaterial and irrelevant," seems similarly to have been a case where there was no dispute as to the plaintiff's complete inability to work and thus no valid basis for admission of the evidence. To such extent, however, as these decisions may support the exclusion of evidence of disability pensions on the issue of the genuineness of the claimed injury and damages in a case like the present, we would reject them in favor of the principle embodied in Murray, Simmons, Page and Reiner.

■ It is true that none of the decisions on which we rely reversed a judgment for erroneous exclusion of pension evidence; their holding that it was proper to admit the evidence does not necessarily mean that the trial judge would have abused his discretion by excluding it. Here it would be sufficient to point out that the judge did not exclude the evidence as a matter of discretion. Rather, he held that "This is clearly superfluous and irrelevant * * *. [T]his would not be admissible; that is, * * * any reference to any pension or compensation that this plaintiff is receiving from this Federal Railroad Retirement Act would have no bearing in this case. * * * [The evidence would be] erroneous to admit." In so ruling the court erred as a matter of law, and at the least deprived defendant of its right to an exercise of discretion on the issue. Cf. United States v. 18.46 Acres of Land, 312 F.2d 287 (2 Cir.1963). On this record, in view of the considerable impact the evidence might have had in supporting defendant's theory of malingering, we cannot deem even such an error to have been harmless. We go further, how-

ever, and say that on the retrial the evidence should be admitted. Its substantial probative value cannot reasonably be said to be outweighed by the risk that it will necessitate undue consumption of time, or that it will create substantial danger of undue prejudice through being considered by the jury for the incompetent purpose of a set-off against lost earnings. See Uniform Rules of Evidence, Rule 45. There is merit in the railroad's position that the same principle which gives special weight to a jury verdict in F.E.L.A. cases argues against the exclusion of competent evidence that clearly satisfies the basic requirement of relevancy, see 1 Wigmore, supra, at 408, 412, and might well influence the jury's decision. Eichel contends that receipt of the railroad's evidence may justify him in introducing evidence as to the provisions and administration of the Railroad Retirement Act in regard to disability pensions and the determination of disability in his own case, so as to rebut a possible inference that he obtained the pension by fraud. But even if the need for such evidence is not eliminated by stipulation or otherwise, the inquiry, if kept within reasonable bounds, does not appear likely to be more distracting than informative. And given a proper limiting instruction,[5] there is no substantial danger of undue prejudice; plaintiff's receipt of a disability pension for a conceded physical defect should in no way prejudice the jury against him, and there is no reason to believe that the jury will be unable or unwilling to comply with the court's instruction as to the proper use of the evidence. See Sprinkle v. Davis, 111 F.2d 925, 931–932, 128 A.L.R. 1101 (4 Cir.1940); Flener v. Louisville & N. R. R. Co., 198 F.2d 77, 80 (7 Cir.1952); 1 Wigmore, supra, § 13; McCormick, supra, at 136.

█ There remains the question whether the new trial should be limited to the issue of damages or should comprehend as well the railroad's responsibility for the 1960 accident. Compare F. R. Civ.Proc. 59(a). The railroad argues that admission of the pension evidence to impeach Eichel as to the reasons for his not working will affect his credibility on the issue of how the accident occurred, and thus that the issues are not sufficiently distinct and severable for a partial new trial. See Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). Although the railroad's position has some plausibility, we disagree. There is here no possibility of confusion and uncertainty in separating the two issues, as there was in the Gasoline Products case; nor is this a situation where separation is made inadvisable by the likelihood that the jury's determination of liability was the result of an illegal compromise or of passion and prejudice against the defendant. See 6 Moore, Federal Practice (2d ed. 1953), ¶ 59.06, at 3762. Neither is this a case where the issue of culpability was so closely contested that anything affecting the plaintiff's credibility might have tipped the scales: defendant chose not to present any of the eyewitnesses who were available to testify in contradiction of plaintiff's version of the accident. In such circumstances it would seem unfair to require Eichel to undergo a retrial of the railroad's culpability, which has been decided in his favor by the jury, solely because the judge erroneously excluded a piece of evidence which

5. The jury should be instructed, in substance, that the receipt of the disability payments may be considered both on the issue whether plaintiff in fact sustained an injury in 1960 and on the issue of the extent of and damage from that injury; that if it finds that plaintiff did sustain an injury but could have engaged in gainful work, it should deduct from his recovery for loss of earnings the amount it finds he could have earned by due diligence, taking into account his physical condition and his opportunities for obtaining employment, before reaching the age at which he would have retired if the accident had not occurred; but that if it finds that his not returning to work was due wholly to his injured condition, it should then ignore the disability payments entirely. It should in no event deduct the payments from the amount that it would otherwise award.

was offered on the issue of damages and whose relevancy pertained in a predominating degree to that issue. The new trial therefore will be limited to the issues of the existence and extent of Eichel's injury. As indicated, this includes two questions—whether Eichel's condition is due at all to the 1960 accident rather than to his prior injuries and pre-existing illness and, if so, the extent of the added injury.

Affirmed as to the determination of negligence; reversed and remanded for a new trial on the issues of injury and damages.